UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| Doreen BAKER, | : | |
|     Petitioner, | : | |
| | : | |
| v. | : | Case No. 3:04cv1923 (PCD) |
| | : | |
| Bill WILLINGHAM, WARDEN, Federal Correctional Institution–Camp Danbury, Connecticut, | : : : | |
|     Respondent. | : | September 16, 2005 |

**RULING ON PETITION FOR WRIT OF HABEAS CORPUS**

    Petitioner Doreen Baker petitions this Court for a writ of habeas corpus pursuant to 28 U.S.C. § 2241 and a writ of mandamus pursuant to 28 U.S.C. § 1361 (1) declaring that the Federal Bureau of Prisons ("BOP") policy limiting prisoner placement in a Community Correction Center ("CCC") to the lesser of six months or the last ten percent of a prisoner's sentence is unlawful, and (2) directing the BOP to use its pre-December 2002 CCC-designation policy to determine Petitioner's eligibility for CCC placement.  For the reasons stated herein, Petitioner's Motion [Doc. No. 58] is **granted**.

**I.    BACKGROUND**

    On December 18, 2002, Petitioner pled guilty to one count of Bank Fraud in violation of 18 U.S.C. § 1344 , in the United States District Court for the District of Vermont before Chief Judge William K. Sessions III.  On May 5, 2003, Petitioner was sentenced to a term of imprisonment of 36 months, to be followed by 3 years of supervised release, and was ordered to pay restitution in the amount of $34,054.57 as well as a $100 special assessment.  The BOP designated Petitioner to the Federal Prison Camp attached to the Federal Correctional Institution

at Danbury, Connecticut, and Petitioner began serving her sentence there on June 10, 2003. Petitioner's sentence expires "full term" on May 30, 2006, but her "projected release date," based on accumulated good conduct time under 18 U.S.C. § 3624(b), is January 9, 2006.

Petitioner's claims arise from a change in the BOP's interpretation of 18 U.S.C. §§ 3621(b) and 3624(c). Section 3621(b) provides, in pertinent part:

> The Bureau of Prisons shall designate the place of the prisoner's imprisonment. The Bureau may designate any available penal or correctional facility that meets minimum standards of health and habitability established by the Bureau, whether maintained by the Federal Government or otherwise and whether within or without the judicial district in which the person was convicted, that the Bureau determines to be appropriate and suitable, considering–(1) the resources of the facility contemplated; (2) the nature and circumstances of the offense; (3) the history and characteristics of the prisoner; (4) any statement by the court that imposed the sentence–(A) concerning the purposes for which the sentence to imprisonment was determined to be warranted; or (B) recommending a type of penal or correctional facility as appropriate; and (5) any pertinent policy statement issued by the Sentencing Commission pursuant to Section 994(a)(2) of Title 28.
>
> In designating the place of imprisonment or making transfers under this subsection, there shall be no favoritism given to prisoners of high social or economic status. The Bureau may at any time, having regard for the same matters, direct the transfer of a prisoner from one penal or correctional facility to another.

Section 3624(c), on the other hand, provides:

> The Bureau of Prisons shall, to the extent practicable, assure that a prisoner serving a term of imprisonment spends a reasonable part, not to exceed six months, of the last 10 per centum of the term to be served under conditions that will afford the prisoner a reasonable opportunity to adjust to and prepare for the prisoner's re-entry into the community.

Prior to December 2002, the BOP interpreted these statutes to permit inmates to serve any or all of their terms of imprisonment in CCCs. Pursuant to this interpretation, the BOP's customary practice was to consider inmates' eligibility for transfer to a CCC for as much as the last six

months of their terms of imprisonment.  See Drew v. Menifee, No. 04 Civ. 9944, 2005 WL 525449, at *2 (S.D.N.Y. March 4, 2005).  On December 13, 2002, the Office of Legal Counsel ("OLC") of the United States Department of Justice issued a memorandum declaring that the BOP's longstanding policy was incorrect.  This conclusion was based on the OLC's interpretation of the term "imprisonment" to exclude placement in a CCC, in which case the authority granted to the BOP under section 3621(b) would not include the authority to place an inmate in a CCC.  Under the OLC's view, the only statute giving the BOP authority to designate an inmates to a CCC would be 18 U.S.C. § 3624(c).  Consequently, the OLC concluded that section 3624(c) controlled and thus an inmate could be transferred to a CCC only in connection with pre-release programming for the lesser of six months or the last ten percent of an inmate's sentence, after deducting good time credits.  See Wiesel v. Menifee, 04 Civ. 9681, 2005 WL 1036297, *1 (S.D.N.Y. May 2, 2005).  In response to the OLC memorandum, on December 20, 2002 the BOP issued its own memorandum limiting pre-release programming CCC designations to the last ten percent of the prison sentence, not to exceed six months (hereinafter "the December 2002 Policy").  See Zucker v. Menifee, No. 03 Civ. 10077, 2004 WL 102779, at *2 (S.D.N.Y. Jan. 21, 2004).

     Under the "10% Rule" established by the BOP's new CCC designation policy, the earliest possible date Petitioner could be eligible for placement in a CCC would be October 7, 2005, rather than July 13, 2005, six months before her projected release date.  Pet. at 4-5.  Through meetings with her Unit Team, Petitioner learned that her recommended "CCC date" coincides exactly with her "10% date"–that is, October 8, 2005.  Pet. at 5.  Thus, on June 9, 2005, Petitioner filed the present petition claiming that (1) the BOP's refusal to consider Petitioner for

any more than 94 days' assignment to a CCC is based on an erroneous interpretation of 18 U.S.C. § § 3621(b) and 3624(c); (2) under the pre-December 2002 Policy, Petitioner would likely be approved for at or approaching 180 days CCC placement; and (3) as applied to a sentence based on an offense committed prior to December 13, 2002, the Policy violates the constitutional prohibition against *ex post facto* laws as it would substantially increase the portion of Petitioner's sentence that must be served in imprisonment.

As Respondent acknowledges, following the promulgation of the December 2002 Policy, the majority of district judges within the Second Circuit and the two circuit courts that have addressed the issue found the policy to be unlawful. See Resp't Opp'n at 4 (citing, among others, Elwood v. Jeter, 386 F.3d 842 (8th Cir. 2004); Goldings v. Winn, 383 F.3d 17 (1st Cir. 2004); Pinto v. Menifee, No. 04 Civ. 5839, 2004 WL 3019760 (S.D.N.Y. Dec. 29, 2004); Cato v. Menifee, No. 03 Civ. 5797, 2003 WL 22725524 (S.D.N.Y. Nov. 20, 2003)).  In response to these decisions, on August 18, 2004, the BOP published proposed new CCC designation regulations in the Federal Register.  The BOP allowed time for interested persons to comment and the final rule took effect on February 14, 2005 (hereinafter "the February 2005 Rule") following the BOP's response to public comments.  The new rule provides as follows:

> § 570.20     What is the purpose of this subpart?
>
> (a)     This subpart provides the Bureau of Prisons' (Bureau) categorical exercise of discretion for designating inmates to community confinement. The Bureau designates inmates to community confinement only as part of pre-release custody and programming which will afford the prisoner a reasonable opportunity to adjust to and prepare for re-entry into the community.
>
> (b)     As discussed in this subpart, the term "community confinement" includes Community Corrections Centers (CCC) (also known as "halfway houses")

> and home confinement.
>
> § 570.21    When will the Bureau designate inmates to community confinement?
>
> (a)    The Bureau will designate inmates to community confinement only as part of pre-release custody and programming, during the last ten percent of the prison sentence being served, not to exceed six months.
>
> (b)    We may exceed these time-frames only when specific Bureau programs allow greater periods of community confinement, as provided by separate statutory authority (for example, residential substance abuse treatment program (18 U.S.C. § 3621(e)(2)(A)), or shock incarceration program (18 U.S.C. § 4046(c))).

28 C.F.R. § 570.20-.21. In practice, the effect of the February 2005 Rule is identical to the December 2002 Policy in that both limit the BOP's discretion to designate inmates to CCCs to the last ten percent of the prison sentence being served, not to exceed six months. See Pimentel v. Gonzales, 367 F.Supp.2d 365, 368 (E.D.N.Y. 2005). The new rule, responding to the findings of many courts that the BOP has discretion to designate inmates to CCCs at any time during their term of imprisonment, recognizes the BOP's discretion but purports to exercise this discretion "categorically"–that is, to only allow the BOP to consider transferring prisoners to CCCs in the last ten percent of their term of imprisonment, not to exceed six months. See Drew, 2005 WL 525449, at *4.

Respondent, in his response to the present Petition, informed the Court that the decision as to Petitioner's CCC placement will be made under the February 2005 Rule. Resp't Opp'n at 1-2. Recognizing the urgency of this matter for Petitioner, however, Respondent agreed to treat the petition as a challenge to the February 2005 Rule. Resp't Opp'n at 2. In her Reply to Respondent's Opposition, filed on July 21, 2005, Petitioner contests application of the February

2005 Rule, arguing that the "10% Rule" challenged in the Petition remains essentially the same under both policies. Pet'r Rep. at 2. Petitioner asks the Court to order prompt CCC placement, or, in the alternative, to grant the BOP a short period of time to evaluate Petitioner's eligibility for CCC placement under the pre-December 2002 policy. Pet'r Rep. at 14-15.

The February 2005 Rule has met with mixed reactions in the courts. To date, no circuit court has reviewed the rule and there is a split among the district courts in the Second Circuit. Compare Moss v. Apker, 376 F.Supp.2d 416 (S.D.N.Y. 2005) (upholding the new rule); Yip v. Federal Bureau of Prisons, 363 F.Supp.2d 548 (E.D.N.Y. 2005) (same); Bialostok v. Apker, No. 05 Civ. 2698, 2005 WL 1946480 (S.D.N.Y. Aug. 12, 2005) (same); Levine v. Menifee, No. 05 Civ. 1902, 2005 U.S. Dist. LEXIS 11362 (S.D.N.Y. June 8, 2005) (same) with Pimentel v. Gonzales, 367 F.Supp.2d 365 (E.D.N.Y. 2005) (same) (finding the February 2005 Rule to be invalid); Drew v. Menifee, No. 04 Civ. 9944, 2005 WL 525449 (S.D.N.Y. March 4, 2005); Wiesel v. Menifee, 2005 WL 1036272, at *9 (striking down the February 2005 Rule on *ex post facto* grounds).

## II.   DISCUSSION

**A.  The February 2005 Rule is Based on an Erroneous Interpretation of 18 U.S.C. §§ 3621(b) and 3624(c)**

On its face, the February 2005 Rule appears to remedy some of the defects in the December 2002 Policy. By acknowledging the BOP's discretion under section 3621(b) to designate an inmate to a CCC at any point in his sentence, the new rule appears to overcome the argument under which the December 2002 policy was struck down–namely, that the BOP

incorrectly interpreted sections 3621 and 3624 by giving precedence to section 3624(c).[1]  See Goldings v. Winn, 383 F.3d 17, 28 (2004); Pinto v. Menifee, 2004 WL 3019760, at *6-*11 (concluding that section 3624(c) limits the BOP's obligation to assure that a prisoner spends the last part of his sentence in a CCC, but does not limit the BOP's discretionary power to place a prisoner in a CCC at any time during his term of imprisonment); Grimaldi v. Menifee, No. 04 Civ. 1340, 2004 WL 912099, at *4 (S.D.N.Y. Apr. 29, 2004) (same).  In effect, however, the February 2005 Rule is identical to the December 2002 Policy, as the BOP continues to refuse to consider inmates for CCC placement prior to their ten percent date.

Analysis of agency rules under the Administrative Procedure Act ("APA") proceeds in two steps.  Initially, the court asks whether Congress has directly spoken to the precise question at issue.  If Congress' intent is clear, the court, as well as the agency, must give effect to it. Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc., 467 U.S. 837, 843 (1984).  If, however, the statute is silent with respect to the particular issue or the statutory meaning is not unambiguous, the court must determine whether the agency's interpretation is reasonable.  Id. at 843-44.  The agency's construction receives substantial deference and should be upheld unless it is found to be "arbitrary, capricious, or manifestly contrary to the statute."  Id.; 5 U.S.C. § 706. The district courts in Terry and Pinto, however, noted that the "consensus" among courts within the Second Circuit is that the BOP's interpretation of the statutes at issue here is entitled only to "some deference," a level less than the "substantial deference" Chevron typically grants to agency

---

[1] The BOP itself acknowledges that section 3624(c) does not take precedence over section 3621(b).  In Program Statement 7310.04 (1998), the BOP plainly states that "A CCC meets the definition of a 'penal or correctional facility'" under section 3621(b).  Therefore, the BOP concludes, they are "not restricted by section 3624(c) in designating a CCC for an inmate and may place an inmate in a CCC for more than 'the last ten per centum of the term,' or more than six months if appropriate." Program Statement 7310.04, 4 (1998), *available at* http://www.bop.gov/DataSource/execute/dsPolicyLoc (last visited September 15, 2005).

regulations. See Pinto, 2004 WL 3019760, at *5; Terry, No. 04 Civ. 4505, 2004 WL 2434978, at *3 (S.D.N.Y. Nov. 1, 2004) (reasoning that BOP interpretations should receive less deference because "Congress did not delegate to the BOP authority to issue rules with the binding effect of law–particularly with regard to the scope of the BOP's authority to place inmates in CCCs at various times during their imprisonment"). The court in Zucker v. Menifee, No. 03 Civ. 10077, 2004 WL 102779, at *5 (S.D.N.Y. Jan. 21, 2004), also questioned the level of deference to be accorded the rules at issue, arguing that the December 2002 Policy should be given less since the interpretation at issue originated with the OLC and not the BOP. Courts typically grant discretion to agencies due to their specialized expertise, Skidmore v. Swift & Co., 323 U.S. 134, 139 (1944), however, the OLC does not have the kind of "direct expertise" that prompts courts to treat agency rules deferentially. See Zucker, 2004 WL 102779, at *5. Moreover, the Supreme Court has noted that only "some deference"–a level lower than that required in Chevron–applies where, as here, the statute does not reflect Congressional intent to delegate to the agency authority to issue rulings with the binding force of law. See id. (citing Skidmore, 323 U.S. at 140).

      Even if the BOP were accorded Chevron-level deference, it is clear that an agency acts "arbitrarily and capriciously if it reverse[s] its position in the face of a precedent it has not persuasively distinguished . . . and if it fails to consider[] all the relevant factors in reaching its decision." New York Cross Harbor R.R. v. Surface Transp. Bd., 374 F.3d 1177, 1181 (D.C. Cir. 2004). Thus, notwithstanding the fact that it recognizes the discretion granted by section 3621(b), the February 2005 Rule fails because the BOP wholly refuses to exercise this discretion. Although, after the Supreme Court's decision in Lopez v. Davis, 531 U.S. 230, 241-42 (2001),

there is little doubt that the BOP can exercise its discretion in a categorical manner through its rule-making power, discretion must still be guided by the language of the statute and the factors Congress has identified.  See Natural Res. Def. Council, Inc. v. Muszynski, 268 F.3d 91, 97 (2d Cir. 2001) (holding that judicial review of agency action is narrow, but includes the determination of "whether the [agency] decision was based on a consideration of the relevant factors" (internal quotations omitted)).  The BOP's policy change here is assertedly justified by section 3621(b), "there shall be no favoritism given to prisoners of high social or economic status."  It ignores the other factors that Congress deemed relevant to such a consideration, including the offense committed, the history and characteristics of the individual prisoner and any pertinent statement by the sentencing court.  Uniformity of application should not be the only goal, especially when, as here, it is achieved only by ignoring the other factors that Congress identified as important.  Although the BOP is not required to *transfer* an inmate to a CCC before his or her ten percent date, the BOP is required to *consider* the appropriateness of transferring an inmate in light of the factors set forth in section 3621(b).  See Drew, 2005 WL 525449, at *6.

      Respondent defends the February 2005 Rule in part based on the BOP's declaration that it "will continue to evaluate these factors when making individual designations to appropriate facilities, and this rule will not adversely affect such individualized determinations."  Resp't Opp'n at 17 (citing 70 Fed. Reg. at 1660).  This defense does not save the rule.  The BOP will consider the section 3621(b) factors only in relation to CCC designations with regard to prisoners who are in the last ten percent of their sentences, or when making designations to facilities other than CCCs.  The explanation draws an "arbitrary and unreasoned distinction" between when it will and will not consider the section 3621(b) factors.  See Drew, 2005 WL 525449, at *5;

9

Pimentel, 367 F.Supp.2d at 375 ("BOP's logic...is an artificial distinction without a statutory basis").

Some courts have upheld the BOP regulation on the basis that the factors listed in section 3621(b) are permissive rather than mandatory, and thus argue that the BOP's interpretation, although ignoring the factors, is reasonable.  See, e.g. Wiesel v. Menifee, 2005 WL 1036297, at *8; Levine v. Menifee, 2005 U.S. Dist. LEXIS 11362, at *17.  The conclusion that the factors are permissive is far from clear, however, and is belied by the legislative history.  Though the language in the statute is ambiguous ("The Bureau may designate any available penal or correctional facility...considering..."), the legislative history suggests that the BOP is *required* to consider the factors set forth in section 3621(b).  The Report of the Senate Committee on the Judiciary accompanying the enactment of section 3621 states:

> In determining the availability or suitability of the facility selected, the Bureau is *specifically required* [by section 3621(b)] to consider such factors as the resources of the facility considered, the nature and circumstances of the offense, the history and characteristics of the prisoner, the statements made by the sentencing court concerning the purposes for imprisonment in a particular case, any recommendations as to type of facility made by the court, and any pertinent policy statements issued by the sentencing commission . . . *After considering these factors*, the Bureau of Prisons may designate the place of imprisonment in an appropriate type of facility, or may transfer the offender to another appropriate facility.

S. Rep. No. 98-225, *reprinted in* 1984 U.S.C.C.A.N. 3182, 3324-25.  The legislative history indicates that although the BOP is not required to transfer a prisoner at any specific time, it is required to make decisions regarding transfer considering the statutory factors.  A blanket failure to consider such factors and exercise discretion accordingly thus violates the statute and its underlying policy.   See Drew, 2005 WL 525449, at *4-6; Pimentel, 367 F.Supp.2d at 375.

Based on the refusal to consider the statutorily mandated factors, it can fairly be said that the February 2005 Rule should be set aside as the agency "entirely failed to consider an important aspect of the problem." See City of New York v. Shalala, 34 F.3d 1161, 1167 (2d Cir. 1994). The BOP's interpretation of the statute must give effect to all portions of the statute; by ignoring other factors, the BOP arbitrarily and unreasonably distinguishes between prisoners who are in the last ten percent of their sentence and those who are not and between CCCs and other federal correctional institutes.[2]  See Drew, 2005 WL 525449, at *6.

As noted previously, the Supreme Court in Lopez authorized the BOP's categorical exercise of discretion in certain instances, however, it may be argued in this case that BOP has not exercised categorical discretion at all, as it has rendered *all* prisoners ineligible for transfer to a CCC aside from those that section 3624(c) requires the BOP to attempt to place in a CCC–i.e., those in the last ten percent of the term to be served.  See Pimentel, 367 F.Supp.2d 365, 374. Lopez involved 18 U.S.C. § 3621(e)(2)(B), under which the BOP may reduce the prison term of inmates convicted of "nonviolent" felonies, if the prisoner first successfully completes a substance abuse treatment program.  Implementing the statute, the BOP defined "crimes of violence" to include felonies attended by "the carrying, possession, or use of a firearm."  28 C.F.R. 550.58(a)(1)(vi)(B) (2000).  The Court held that the BOP's categorical exclusion of offenders who possessed a firearm in connection with their offenses was permissible, reasoning

---

[2] The BOP itself acknowledges that "CCCs provide an excellent transitional environment for inmates nearing the end of their sentences.  The level of structure and supervision assures accountability and program opportunities in employment counseling and placement, substance abuse, and daily life skills." Program Statement 7310.04, 1 (1998); *available at* http://www.bop.gov/DataSource/execute/dsPolicyLoc (last visited September 15, 2005).  In light of the avowed utility of CCCs and Congress' grant of discretion to the BOP, the BOP has presented no rationale for arbitrarily deciding not to exercise their discretion to consider whether prisoners are eligible for CCC transfer before the ten-percent date, consistent with Congress' express intent to facilitate reintegration into society.

11

that "even if a statutory scheme requires individualized determinations...the decisionmaker has the authority to rely on rulemaking to resolve certain issues of general applicability unless Congress clearly expresses an intent to withhold that authority. Lopez, 531 U.S. at 243 (internal quotations omitted). Having concluded that the BOP may exercise its discretion in a categorical manner, the Court found, based on congressional concerns regarding behavior that suggested a propensity for violence and the corresponding risk to public safety, that the BOP's interpretation of the statute was a reasonable one. See id. at 244. In this case, however, the BOP Rule does not merely "delineate the boundaries of its discretion consistent with congressional intent," but "removes all discretion in all cases in determining whether to transfer an inmate to a CCC at any time prior to the last ten percent of an inmate's sentence." Pimentel, 367 F.Supp.2d at 374. The February 2005 Rule, unlike the rule at issue in Lopez, in no way furthers or interprets the section 3621(b) factors. Id. at 375. This court, like the courts in Pimentel and Drew, is not convinced that the BOP may categorically abnegate its responsibility to exercise discretion where the enabling statute provides specific factors relevant to individualized determinations.[3]

**B. Exhaustion**

A petitioner is required to exhaust all available administrative remedies before seeking federal habeas review of an adverse administrative agency decision unless exhaustion would be futile. See Theodoropoulous v. INS, 358 F.3d 162, 171 (2d Cir. 2004). Here, Respondent does not challenge Petitioner's action on the basis that Petitioner may have failed to exhaust any

---

[3] As the Court in Drew noted, the BOP can still exercise its discretion under section 3621(b) categorically. The BOP has authority to categorically determine that the nature and circumstances of a particular offense or the history and characteristics of a particular class of prisoners present concerns that outweigh the other 3621(b) factors. The February 2005 Rule in no way relates to or considers these factors and is therefore an arbitrary exercise of the BOP's discretion.

available administrative remedies. If the exhaustion issue had been raised, however, the court would have concluded that exhaustion of administrative remedies would have been futile as it is clear that Petitioner's claim would have been rejected based on official BOP policy. See Drew, 2005 WL 525449, at *3; Pinto, 2004 WL 2434978, at *2. Accordingly, failure to exhaust available remedies would have been excused.

### C. Administrative Procedure Act

Petitioner argues the December 2002 Policy violated the APA in that the BOP did not provide public notice of its intended promulgation of the rule and did not provide an opportunity for interested persons to participate in the rulemaking. See 5 U.S.C. § 553(b)-(d); Cato v. Menifee, No. 03 Civ. 5795, 2003 WL 22725524, at *5 (S.D.N.Y. Nov. 20, 2003) (holding that adoption of the December 2002 Policy without notice and comment procedures violated section 553 of the APA); Pinto v. Menifee, 2004 WL 3019760, at *12-13 (finding the December 2002 Policy void for having been adopted without the notice and comment procedure). The February 2005 Rule, in contrast to the December 2002 Policy, was enacted by the BOP pursuant to the proper notice and comment rulemaking procedures of the APA. See 5 U.S.C. § § 551, 553. When applied to the February 2005 Rule, Petitioner's claim that the APA's notice-and-comment requirements were not followed is without merit. See Wiesel v. Menifee, 2005 WL 1036297, *4.

### C. Ex Post Facto Clause

Petitioner claims that the February 2005 Rule violates the *Ex Post Facto Clause* because it constitutes a retroactive increase of the portion of her sentence that must be served in imprisonment. Having already found that the February 2005 Rule is based on an erroneous interpretation of the underlying statutes, it is unnecessary to decide whether it also violates the

13

Constitution.  See Ashwander v. Tennessee Valley Auth., 297 U.S. 288, 347 (1936) (Brandeis, J., concurring) ("The Court will not pass upon a constitutional question...if there is also present some other ground upon which the case may be disposed of."); Slack v. McDaniel, 529 U.S. 473, 475 (2000) (referring to and applying the "*Ashwander* Rule").

### III.    CONCLUSION

For the foregoing reasons, Petitioner's Motion for writ of habeas corpus pursuant to 28 U.S.C. § 2241 [Doc. No. 58] is **granted** and Respondent is ordered, in good faith, to consider the appropriateness of transferring Petitioner to a CCC in light of the factors set forth in section 3621(b) and any other factors that the BOP deems relevant, without reference to the December 2002 Policy or the February 2005 amendment to 28 C.F.R. § 570.21.  As time is of the essence, Respondent is to make this determination promptly, and, in no event, later than ten (10) days from the date of this Order.

SO ORDERED.

Dated at New Haven, Connecticut, September 16, 2005.

/s/
Peter C. Dorsey
Senior United States District Judge